UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

-------------------------------------------------------------------- X

AMISHA FORBES,

                               Plaintiff,

               -against-

NASSAU UNIVERSITY MEDICAL CENTER,
NASSAU HEALTH CARE CORPORATION, BRUCE
LaPLANTE, in his individual and official capacity, and
JOHN ACQUAVELLA, in his individual and official
capacity,

                              Defendants.

-------------------------------------------------------------------- X

**DOCKET NO: CV-21-1829**

**COMPLAINT**

***JURY TRIAL DEMANDED***

     Plaintiff AMISHA FORBES, by  and through her attorneys, the LAW OFFICES OF FREDERICK K. BREWINGTON, as and for her Complaint, against the Defendants, respectfully sets forth:

## PRELIMINARY STATEMENT

     1.    This is a civil action seeking monetary relief (including past and ongoing economic loss), injunctive relief, declaratory judgment, compensatory and punitive damages, disbursements, costs and fees for violations of the Plaintiff's rights, brought pursuant to Title VII of the Civil Rights Act of  1964, 42 U.S.C. 2000 *et seq.* (as amended), 42 U.S.C. §§1983, 1981, 1988,  New York State's Human Rights Law, Executive Law § 296, and  Nassau County Human Rights Law.

     2.    Specifically,  the  Plaintiff  alleges that the collective Defendants engaged in discrimination, retaliation, and negligently, wantonly, recklessly, intentionally and knowingly sought to, and did, wrongfully deprive Plaintiff of her employment, position, title and pay through misrepresentation, misinformation, retaliation, character assassination, wrongful termination.  These

acts were taken against Plaintiff because of her race, color, gender, and national origin.

3.      Said acts were done knowingly with the consent and condonation of the NASSAU HEALTH CARE CORPORATION (hereinafter "NHCC"), BRUCE LaPLANTE (hereinafter "LaPLANTE"), and JOHN ACQUAVELLA (herein "ACQUAVELLA"), with the express purpose of removing and silencing the Plaintiff, and generally violating her rights, as protected by the United States and New York State Constitutions, and federal and state statutes, rules and regulations.

## PRIOR PROCEEDINGS,  JURISDICTION AND VENUE

4.      The jurisdiction of this Court is invoked under 28 U.S.C. §§1331 and 1343.

5.      This Court is requested to exercise pendant jurisdiction with respect to Plaintiff's State law claims pursuant to 28 U.S.C. § 1367.

6.      Venue in the Eastern District of New York is proper under  28 U.S.C. §1391, based on the fact that Plaintiff resides in Nassau County, New York and the Defendants are conducting business in the State of New York, specifically Nassau County.

7.      Prior hereto, Plaintiff filed several Charge of Discrimination Complaints against NHCC (Case Nos. 10154567; 10170826; 10174384; 101096456) alleging harassment, discrimination, and  her wrongful termination , due to Defendants' animus on the basis of Plaintiff's race, color, gender, and national origin.

8.      On or about January 2012, Plaintiff first filed a New York State Division of Human Rights  complaint against NHCC due to being wrongfully terminated while Plaintiff was on maternity leave. Plaintiff was eventually rehired on or about Summer of 2012. Additionally, Plaintiff received back pay.

2

9.       On or about August 24, 2018, Plaintiff filed an amended NYSDHR Complaint amending the caption to reflect the correct name for Defendant NHCC, and asserted a claim for retaliation against Defendant NHCC.  As part of a settlement agreed to by the Parties through the assistance of the NYSDHR, NHCC agreed to promote Plaintiff to a full-time position,  and in return Plaintiff withdrew her Complaint against NHCC on August 16, 2018.

10.       On February 13, 2019, Plaintiff filed a NYSDHR Charge of Discrimination  (Case No. 10200178)  against Defendant NHCC  alleging that her wrongful termination was  due to the Defendants'  animus against Plaintiff on the basis of her race, color, national origin and sex.

11.       On August 27, 2019, the  NYSDHR, after concluding its investigation, determined that probable cause exists to believe that the Defendant has engaged in or is engaging in the unlawful discriminatory practice complained of.

12.       Plaintiff has requested and received a Dismissal for Administrative Convenience from the New York State Human Rights Commission, due to Plaintiff's desire to pursue her claims in Federal Court. That Administrative Dismissal was issued on March 10, 2020.

13.       Plaintiff received a  Notice of Suit Rights on January 15, 2021.

14.       The Notice was dated January 5, 2021, on the signature of  Judy A. Keenan, District Director of the U.S. Equal Employment Opportunity Commission (hereinafter "EEOC").

15.       The postmark on the envelope in which the Notice was sent, indicates that the Notice was sent on January 13, 2021.

16.       Further, the postage used to pay for the mailing of the letter is dated August 13, 2020, which is prior to when the Notice of Suit Rights was issued.

3

17.     This suit is being filed within 90 days of receipt of the Notice of Suit Rights. (See **Exhibit A**).

## PARTIES

18.     Plaintiff, AMISHA FORBES (hereinafter "Plaintiff" or "Forbes"), at all times relevant in her Complaint, is a South Asian woman with brown skin originating from the country of India. Plaintiff resides in the County of Nassau, State of New York, and at all times relevant in her complaint was an employee of Defendant NHCC.

19.     During all times relevant in this Complaint, Defendant NASSAU UNIVERSITY MEDICAL CENTER (hereinafter "NUMC") was, and is, a public health facility, and at all relevant times was owned and operated by NASSAU COUNTY HEALTH CARE CORPORATION (hereinafter "NHCC") and was previously owned and operated by the County of Nassau and served as an agency/department of NASSAU COUNTY.

20.     NASSAU HEALTH CARE CORPORATION, is a public health corporation, is the owner of NUMC, and is responsible for the actions of each of its officers, agents, employees, servants and designees. NUMC has, at all relevant times to this case, had more than 3,500 employees. When NUMC is referenced, it is intended to include NHCC when proper.

21.     During all relevant times in this Complaint, Defendant Bruce LaPLANTE (hereinafter "LaPLANTE"), a White male, sued here in his official and individual capacity, is an employee of the Defendant NHCC, and at all relevant times was employed by Defendant NUMC/NHCC. At all relevant times, Defendant LaPLANTE was a Supervisor at NUMC's Public Safety Department, and later became the Captain/Director of NHCC's Public Safety Department.

4

22.      During all relevant times in this Complaint,  Defendant LaPLANTE, in his individual and in his official capacity, was  at all times herein mentioned a supervising employee, employed by the NUMC and was under the direction of NHCC. During all relevant times, DEFENDANT LaPLANTE was acting in furtherance of the scope of his employment.

23.      During all relevant times in this Complaint, Defendant JOHN ACQUAVELLA (hereinafter "ACQUAVELLA"), a White male, sued here in his official and individual capacity, is an employee of the Defendant NHCC, and at all relevant times,  was a Supervisor in the Public Safety Department at NUMC/NHCC.

24.      During all relevant times in this Complaint,  Defendant ACQUAVELLA, a White male, sued here in his official and individual capacity, is an employee of the Defendants NUMC/NHCC, and at all relevant times was a Supervisor in the Public Safety Department at NUMC/NHCC.

25.      During all relevant times in this Complaint,  Defendant ACQUAVELLA, in his individual and in his official capacity , was  at all times herein mentioned, a supervising employee, employed by the NUMC and under the direction of NHCC. During all relevant times in this Complaint, DEFENDANT ACQUAVELLA was acting in furtherance of the scope of his employment.

26.      Where allowed by law, Defendants  NUMC and  NHCC  are  vicariously liable for the acts of their employees, servants, and contractors.

27.      During all times mentioned in this Complaint, Defendants, each of them, separately and in concert, engaged in acts and omissions which constituted deprivation of the constitutional rights, privileges and immunities of the Plaintiff. While these acts were carried out under color of

law, the Defendants had no justification or excuse in law. Their acts were, instead, gratuitous, illegal, improper and unrelated to any activity in which Public Safety Department employees may appropriately, and legally engage, in the course of supervising, promoting, evaluating, and disciplining, and terminating employees.

28.     During all times mentioned in this Complaint, Defendants had the power and the duty to properly train and supervise their employees and prevent them from violating the law and the rights of the Plaintiff. Each Defendants was actively involved in discriminating, harassing, and retaliating against Plaintiff, or were aware of the Defendants' wrongful conduct and did not take action to address the problem.

29.     During all times mentioned in this Complaint, each Defendant was acting under color of law, to wit, under color of Constitution, statutes, ordinances, laws, rules, regulations, policies, customs, and usages of the United States, State of New York and/or County of Nassau.

30.     Defendant NHCC was, and is, an employer within the definition of the New York State Executive Law, Title VII, and employs well over 15 employees. Upon information and belief, NHCC oversees, maintains, manages/supervises, and controls several departments, agencies and employees, including but not limited to those employed in the NUMC/NHCC Public Safety Department.


**FACTUAL ALLEGATIONS**

31.     Plaintiff is a Brown skin Asian woman of Indian national origin who is a mother of two children. Plaintiff resides in the County of Nassau.

6

32.     On or about October 18, 2010, was hired by NUMC/NHCC as a part-time Public Safety. Plaintiff was employed as a part-time Public Safety Officer until on or about August 2018. Plaintiff was then promoted to a full-time position as a Public Safety Officer and held that title until she was wrongfully terminated on February 11, 2019.

33.     Upon information and belief, when Plaintiff began her employment at NHCC's Public Safety Department, the majority of Public Safety Officers were White and male. However, several years later, Defendants NHCC and LaPLANTE began hiring mostly African American and Latino individuals to counter allegations of NHCC's racist practices in hiring. However, when Plaintiff began her employment at NHCC/NUMC's Public Safety Department, she was the only Asian woman, and the only Indian woman working in the Public Safety Department. Throughout Plaintiff's employment at NHCC, there was one other employee of Indian background and/or origin, and there was a total of three (3) Asian individuals (including Plaintiff) employed by Defendant NHCC's Public Safety Department.  Both of the other Asian employees who worked at the Public Safety Department were males.

34.     Plaintiff's duties as a Part-time Public Safety Officer included staying at, observing, and maintaining posts, assisting in providing security to visitors to and employees of DEFENDANT NHCC, accompanying patients being transferred, and other related duties as requested.

35.     During the course of her employment, Plaintiff has been subjected to, and the victim of, an ongoing level of mistreatment, abuse, race based differential treatment, gender harassment and discrimination, and other mistreatment which created a toxic and hostile work environment. Plaintiff sought full-time employment but was denied that status for more than eight years despite positive performance reviews and evaluations.

36.     When Plaintiff began her employment at NUMC/NHCC, Defendant  LaPLANTE initially was Public Safety Department Supervisor. Upon information and belief, Defendant LaPLANTE was later  promoted to the position of Captain of the Public Safety Department at NHCC/NUMC, which is the highest ranking person in the Department.  Defendant LaPLANTE's authority included, but was not limited to, the authority to hire, promote, write-ups, or terminate Safety Officers at NHCC. Defendant LaPLANTE at all times relevant to this case was, and is, a decision-maker and policy setter.

## THE BEGINNING OF AN ABUSIVE AND HOSTILE WORK ENVIRONMENT

37.     On April 5, 2011, Plaintiff and her husband, Garfield Forbes, a NHCC Public Safety Officer, became married.  Garfield Forbes is a Black Jamaican man.  After Plaintiff married her husband, several Public Safety Department employees began verbally abusing, targeting and harassing Plaintiff due to her marriage to a Black Jamaican  man.

38.     At various points, in a puzzling twist, NHCC Public Safety employees and supervisors, who were all White, accused Plaintiff of being racist, because she married a Black Jamaican man. Their comments ranged from inappropriate and offensive, to hostile and outright race-based statements. For example, Plaintiff asked a  former co-worker MARIO (at the time clock) what his name was, as she had forgotten. Sidney Bendrihem, a White male  Public Safety Officer, responded, "[Plaintiff] forgot your name because you're not Black."

39.     David Bartwink, a White NHCC employee, also harassed Plaintiff by repeatedly falsely stating to Public Safety Officers working the Emergency Room  post that Plaintiff was racist toward White individuals. Plaintiff then began noticing that people were keeping their distance from her at work based on false allegations that she is racist toward White individuals.

40.     Further, Plaintiff's former co-workers at the Public Safety Department of Defendant NHCC, commented about Plaintiff studying to become a citizen. For example, Plaintiff's former co-worker, Kenneth Ryan, a White man, told Plaintiff that she is "trying to become one of them" by applying to become a U.S. citizen.

41.     On one occasion, Mario Castagnaro, a White NHCC Public Safety Officer, who was working with Plaintiff at a parking lot Post, asked Plaintiff to look at a sex toy/dildo that he had placed in a security van. Plaintiff did not know what the object was, and questioned Mario as to what the object was. Mario responded to Plaintiff, by taunting her saying "you don't know what it is, look at it, look at it, it's a black thing, it's a black," referring to the color of the sex toy.

42.     Defendant LaPLANTE was also one individual who disapproved of Plaintiff's marriage to a Black man. In addition to his animus toward Plaintiff based on her race, color, national origin, and sex/gender, his animus was clear as to his disapproving of Plaintiff marrying a Black man.

43.     In or about June 2011, while Plaintiff was five (5) months pregnant, Defendant LaPLANTE forced Plaintiff to work at an outdoor standing post in 95-degree Fahrenheit weather. On very hot or very cold days, Defendant LaPLANTE allowed other Public Safety Officers to do their posts from a work van, and on hot days Public Safety Officers were given full and free access to water.

44.     However, while five (5) months pregnant, Plaintiff, was denied use of the van, was forced to work and stand up in extremely hot weather for hours, was not allowed to work her post from the van, and was not provided with any water, as would typically be provided to other non-Asian Public Safety Officers.

45.      Further, when Plaintiff attempted to refill her water bottle and keep it close to her post so that she would not become dehydrated, Defendant LaPLANTE refused to allow her to do so. Defendant LaPLANTE went as far as requiring that Plaintiff only use her breaks when she wanted to drink water, instead of being able to drink water at her post.

46.      Due to the heat and  being pregnant at the time, Plaintiff  began shaking, feeling dizzy, and her legs began to swell. Plaintiff called her husband, an employee of NUMC/NHCC, and Plaintiff broke down crying while explaining to her husband the abuse and differential treatment to which she was being subjected by Defendant LaPLANTE and other Department employees.

47.      Thereafter, Plaintiff's husband  contacted Defendant LaPLANTE, and requested that Plaintiff's post be changed due to her pregnancy. In response Defendant LaPLANTE became visibly upset and stated that he had nowhere else to post Plaintiff, despite Plaintiff's observations that there was multiple indoor/sitting post available.

48.       Despite Plaintiff's husband's complaints, no resolution was offered or found. Defendant LaPLANTE instead called Plaintiff into his office and began screaming and cursing  at Plaintiff, who again, was five (5) months pregnant at the time.   At the meeting Defendant LaPLANTE berated and yelled at Plaintiff, saying,  amongst other offensive remarks, "why did you call your husband?" At the same meeting Defendant LaPLANTE continued to yell at Plaintiff and unreasonably screamed at Plaintiff saying, " If you can't do your job you need to quit!"

49.      Additionally, when Plaintiff was about four or five months pregnant, she began bleeding while working at a post at the Defendant NHCC's Public Safety Department. Plaintiff began feeling scared, and feared that she was going to lose her baby due to the bleeding and pregnancy complications she was experiencing. Plaintiff went downstairs in the hospital, where one

of the Public Safety Department officers was located, and told a female Public Safety officer that she needed to check herself into the Emergency Room (hereinafter "E.R."). Plaintiff then headed to the E.R. but before she could arrive there, Lieutenant Phillip Lent (hereinafter "Lt. Lent") instructed Plaintiff to come downstairs to the office. Lt. Lent further instructed Plaintiff to go to the 9th floor of the hospital to open a door. Plaintiff did so and subsequently went back downstairs to return the key, despite the fact that she was facing an emergency medical situation and experiencing severe pain, including pelvic and back pain.

50.     After Plaintiff opened the door as instructed, Lt. Lent began yelling at her and told Plaintiff that if she needs to go to the E.R. she has to let one of her supervisors know in advance, contravening an acknowledgment that an emergency is by nature an unplanned situation that one cannot provide notice for in advance. Eventually, Defendant LaPLANTE became aware of what happened, and stated to Plaintiff that if she can't do the job she should be terminated, further demonstrating Defendant LaPLANTE's and other Department employees' wrongful, unreasonable, and retaliatory conduct to which they subjected Plaintiff.

51.     Defendant LaPLANTE continued harassing and retaliating against Plaintiff without valid justification or reason throughout Plaintiff's employment at Defendant NHCC. Defendant LaPLANTE wrote-up, harassed, and reported Plaintiff to H.R. several times a week. The hostility was ongoing and overt. Defendant LaPLANTE would also frequently stare at Plaintiff for long periods of time when she was at her post. Defendant LaPLANTE also had a pattern of assigning Plaintiff to posts where she could be viewed on the surveillance system "to make sure she was doing her job," while in fact doing so was a part of Defendant LaPLANTE's goal of harassing and intimidating Plaintiff.

11

52.     The general practice of the NHCC Public Safety Department was that Safety officers

began as part-time employees, and were required to undergo a five (5) year probation period after

being hired. Additionally, Part-time Public Safety Officers at NHCC were not allowed to join the

union (Civil Services Employees Association) and NHCC's Human Resources Representatives, upon

information and belief, did not investigate part-time employees' complaints. Because of this Plaintiff

did not report the majority of the abuses and harassment to which she was subjected by Defendants

and NHCC employees. Further, Plaintiff desperately needed her job, and was scared of being fired

for reporting the abuse and misconduct she endured at Defendant NHCC.

53.     In or about January 2012, Defendant LaPLANTE, then a Department Supervisor

persuaded Jamie Engel (hereinafter "Mr. Engel"), the then Head of NHCC's Public Safety

Department, to wrongfully terminate Plaintiff while she was on maternity leave. Mr. Engel

purportedly terminated Plaintiff because her security license expired.

54.     Upon information and belief, no other Public Safety Officer has ever been terminated

for such a reason. The general practice at NHCC was that if an officer's license expired, the officer

would simply be unable to work until his or her renewal was processed and they were given time to

correct this administrative process. However, upon information and belief, Defendant LaPLANTE

encouraged Mr. Engel to wrongfully terminate Plaintiff due to Defendant LaPLANTE's animus

toward Plaintiff.

55.     Despite this normal policy and practice in the Public Safety Department at NHCC,

Defendant LaPLANTE chose to target Plaintiff, wrongfully terminate Plaintiff, and completely

ignored the above-mentioned policy. The forced wrongful termination of Plaintiff was based on

frivolous reasons and did not conform to how Defendants treated other NHCC Safety Officers

12

who were not women from India.

56.     Upon information and belief, Plaintiff was wrongfully terminated for a period of about seven (7) to eight (8) months. Due to Mr. Engel wrongfully terminating Plaintiff, and Defendant LaPLANTE'S and others' discriminatory treatment of Plaintiff, Plaintiff had no other recourse other than to file a NYSDHR Complaint against Defendant NHCC.

57.     It was well known within the Defendant's agency that Defendants discriminate against women who have children by delaying transfers or promotional opportunities, rather than providing them in a timely fashion, as compared to men or women who were not parents.

58.     After Plaintiff was wrongfully terminated by Defendant LaPLANTE Plaintiff first spoke to a Human Resources (herein "H.R.") Representative at NHCC. However, it was to no avail. As a result of H.R. failing to obtain a remedy for Plaintiff's wrongful termination, Plaintiff then filed a Complaint with the NYSDHR charging the DEFENDANTS with discrimination on the basis of her pregnancy and wrongful termination. Plaintiff was eventually rehired during the Summer of 2012, and received back pay as a result of negotiations between Plaintiff and NYSDHR and NHCC's Human Resources Department. Mr. Engel was eventually promoted to a different position, but before he left said position he apologized to Plaintiff for wrongfully terminating her, and stated that he did so due to Defendant LaPLANTE's influence.

59.     Upon Plaintiff's return to NHCC/ NUMC, Defendant LaPLANTE continued to treat Plaintiff differently than similarly situated non-female, non-Asian employees. Upon information and belief, when Plaintiff returned to NUMC/NHCC Defendant LaPLANTE was employed as Captain/Head of the Public Safety Department.

60.     From the onset of Plaintiff's employment with Defendant NHCC, Plaintiff expressed her interest in working as a full-time Public Safety Officer. However, Plaintiff was repeatedly denied promotion to a full-time position without adequate reason or justification. At various points during Plaintiff's tenure at Defendant NHCC, non-female, non-Asian junior NHCC staff members with less or no security experience were hired at NHCC as full-time Public Safety Officers while Plaintiff remained a part-time employee with no benefits.

61.     Shortly after Plaintiff's return to work sometime during the Summer of 2012, after her maternity leave and wrongful termination, Plaintiff was denied full-time employment, despite receiving positive evaluations. During that time, Steve Greco, a Caucasian employee with less experience who was hired years after Plaintiff was hired for a full-time position as a Public Safety Officer.

62.     In or about November of 2012, Plaintiff was wrongfully written-up for allegedly standing a few feet away from her post, and for insubordination. Plaintiff reported to NHCC head and at that time she explained to Defendant LaPLANTE that a large number of Federal Emergency Management Agency (hereinafter " FEMA") employees were gathered in the post area in order to take showers. As a result, Plaintiff decided to move a short distance away from her post to allow the FEMA employees access to the shower area. Lieutenant Lent reported Plaintiff to Mr. LaPLANTE, who began aggressively yelling at Plaintiff and responded that he did not want to hear Plaintiff's explanation. Further, Defendant LaPLANTE began shouting "I don't want to talk to you! Get out! Get out!  Go back to your post and don't spoil my Thanksgiving."

63.     Upon information and belief, on said day, all Public Safety Department personnel, were not required to be on post and were allowed to attend Thanksgiving festivities at headquarters.

14

However, Plaintiff, and one other NHCC employee, Thomas Williams, an African American Supervisor at the Public Safety Department, were required to be on post and were not allowed to attend the holiday celebrations.

64.     Defendant LaPLANTE continued to wrongfully target and harass Plaintiff whenever he had the opportunity to do so throughout Plaintiff's employment at Defendant NHCC. Defendant LaPLANTE constantly attempted to find any excuse to fire Plaintiff. Defendant LaPLante monitored when Plaintiff returned from lunch breaks, assigned Plaintiff overtime on dates and times that he knew was inconvenient for Plaintiff, (for example, when he was aware Plaintiff needed to pick up her son), and used any opportunity he could to target and harassed Plaintiff.

65.     One such incident occurred on or about January 18, 2013,  during which Defendant LaPLANTE wrongfully wrote Plaintiff up for not reporting for an 8:00 a.m. – 4:00 p.m. overtime shift. Plaintiff explained that she took it upon herself, and contacted the office the night before to confirm any scheduled overtime. Plaintiff spoke to Lieutenant Hillyer, a White male, who erroneously, and apparently inadvertently informed Plaintiff that she was not scheduled for overtime. Lieutenant Hillyer confirmed these facts, and explained the matter to Defendant LaPLANTE. However, Defendant LaPLANTE still issued the write-up against Plaintiff. This was done intentionally to harm Plaintiff, despite the fact that it was a Supervisor who misled Plaintiff to believe that she was not required to work overtime on that date.

66.     On or about August 2013, upon reporting for an overnight shift, Plaintiff was sent home by Defendant LaPLANTE for having an ace bandage wrapped around her wrist. In response to being questioned by Defendant LaPLANTE about the bandage, Plaintiff took off the bandage to demonstrate to LaPLANTE that her wrist was otherwise fine but that she was  using the bandage for

15