a "slight ache." However, Defendant LaPLANTE still deprived Plaintiff of the shift, and forced Plaintiff to go home for wearing an ace bandage. Defendant LaPLANTE allowed non- Asian female Safety Officers to work while they had both minor and more serious injuries.

67. Defendant LaPLANTE's differential treatment of Plaintiff was manifested during a variety of incidents and encounters he had with Plaintiff. When Defendant LaPLANTE sent Plaintiff home for wearing an ace bandage on her wrist, Defendant's bias against Plaintiff became even more clear as Plaintiff was well aware of several co-workers, including Suzanna Lima, a Portuguese woman, who Defendant LaPLANTE allowed to work a shift while wearing a cast on her arm. Further, Plaintiff repeatedly observed that Defendant LaPLANTE allowed other non-Asian-female Officers to work their shifts at NHCC while suffering from serious injuries.

68. Defendant LaPLANTE targeted Plaintiff in a number of ways and created a hostile work environment for Plaintiff by attempting to sabotage Plaintiff in any way he could, including denying her privileges he afforded to other non-Asian-female Officers, pressuring other Defendant NHCC Public Safety Department employees to write false allegations of misconduct against Plaintiff, and conspiring to get Plaintiff fired.

69. The general practice of the Public Safety Department at NHCC was that White officers, and/or non-Asian-female Overnight Safety Officers were allowed to sit in the security van while posted on ER1 (Emergency room entrance) during frigid temperatures.

70. Similar to the actions taken against Plaintiff in 2012, on or about December 2013, the temperature was very cold, and Defendant LaPlante repeatedly denied Plaintiff use of a work van while working an overnight shift, despite the fact that officers who were not Asian women were allowed to use the van while working an overnight shift or when the temperature was extremely

cold. Only Plaintiff was denied use of the van despite the low temperatures, and the general practice in the Public Safety Department.

71. Sometime in 2013, Plaintiff was yet again denied full-time employment despite receiving positive performance reviews and evaluations. No reason as to why she was refused full-time status was provided. However, Officers Kara Krzyzanowski, Michael O'Dell and James Vossler, who are all Caucasian and were hired years after Plaintiff, were promoted to full-time status ahead of Plaintiff. Plaintiff advised Human Resources, and the Union Civil Services Employees Association (hereinafter "CSEA"), but they took no action.

72. Again, on or about June 2014, Plaintiff was denied full time employment, while her coworkers, Suzanna Lima and Brian McAllister, who had significantly less experience, were hired full-time. Suzanna Lima is a White Portugese woman and Brian McAllister is a Caucasian man.

73. On or about July 23, 2014, Plaintiff spoke with Defendant LaPLANTE to again request consideration for full-time employment. Defendant LaPLANTE stated that Plaintiff is a good employee, and claimed that there were no personal issues stopping him from promoting her to a full- time position.

74. However, on July 28, 2014, according to NUMC's EEOC Officer Margaree Mack-Glen, Bruce LaPLANTE stated that Plaintiff was unreliable for scheduling, and that he would not be able to hire her full-time for another two (2) to three (3) years. This statement by Defendant LaPLANTE contradicted his previous statement to Plaintiff that she had performed satisfactorily, and was a good candidate for a full-time Public Safety Officer position.

75. During 2015 Plaintiff was yet again denied full-time employment in the Public Safety Department of NHCC while a co-worker with similar experience, Kevin Gonzalez, a

non-female and non-Asian former co-worker, was hired for a full-time Public Safety Officer position. Plaintiff complained of, and sought support from her Union but they took no action on Plaintiff's behalf.

76. Plaintiff observed that other Part-time Public Safety Officers hired several years after her were promoted to full time Public Safety Officer despite Plaintiff's years of experience and positive evaluations.

77. The following includes a non-exhaustive list of Public Safety employees who were given full-time employment despite being hired several years after Plaintiff:

- 2012 - Steve Greco (a White male) hired as a full-time Public Safety Officer
- 2013 - Jim Vossler (a White male) hired as a full-time Public Safety Officer
- 2013 - Michael O'Dell (a White male) hired as a full-time Public Safety Officer
- 2014 - Suzzanna Lima (a White Portuguese female) hired as a full-time Public Safety Officer
- 2014 - Brian McAllister (a White male) hired as a full-time Public Safety Officer
- 2015 - Kevin Gonzalez (a Hispanic male) hired as a full time Public Safety Officer
- August 2018 - Moris Hernandez (a Hispanic male) hired as a full-time Public Safety Officer

78. The difference in being a full-time and part-time employee includes, but is not limited to, a major difference in pay, longevity, health care benefits, pension benefits, and other benefits and perks.

79. On January 24, 2015, Plaintiff was written-up by Defendant ACQUAVELLA for reporting to her post (ER2) late, despite Plaintiff calling head quarters at 7:42 a.m. to advise her Supervisors that she was running late due to heavy snow. On said date, Plaintiff clocked in at 8:07 a.m. for her 8:00 a.m.-4:00 p.m. shift and was further delayed in reporting to her post by Sgt. Davy. Sgt. Davy was busy at headquarters which required Plaintiff to wait until Sgt. Davy was finished in order for Sgt. Davy to assign Plaintiff a radio and keys needed to perform her duties so she could

sign in. Sgt. Davy explained this to Defendant LaPLANTE. However, Plaintiff was still written-up even with the Public Safety Department's normal policy that all department employees were allowed a seven (7) minute grace period before being considered late for their post. This treatment was different from how others were treated by LaPLANTE and ACQUAVELLA.

80. Plaintiff was not in any manner repeatedly tardy, and indeed for the majority of her employment at NHCC she always reported to work on or before time. As an example, Plaintiff's time card for January 1, 2015 to June 26, 2015 showed that Plaintiff was only tardy on one occasion and was seven minutes late.

81. On or about February 4, 2015, Plaintiff was written up by Defendant LaPLANTE due to his false allegations that Plaintiff shouted at Supervisor ACQUAVELLA, when it was Defendant ACQUAVELLA who in fact shouted at Plaintiff. ACUAVELLA and LaPLANTE attempted to manufacture a basis to harm Plaintiff. This treatment was different from how others were treated by LaPLANTE and ACQUAVELLA. Plaintiff would have been terminated because of the false allegation if not for an audio recording of Defendant ACQUAVELLA verbally abusing and shouting at Plaintiff. It was only after Plaintiff revealed that she had an audio recording of the incident that Defendant ACQUAVELLA was reprimanded by Michael Ferrandino, the then VP of Public Safety at NHCC.

82. From February 2015 to March 2018, Plaintiff did not have any incidents with Defendant LaPLANTE because he was transferred to A. Holly Patterson (another facility) to oversee operations and Michael Ferrandino became the V.P. of Public Safety at NHCC.

83. Defendant LaPLANTE returned to NHCC sometime in 2018 and was promoted to the position of Captain of NHCC's Public Safety Department.

84. At the time of Defendant LaPLANTE's promotion to Captain of NHCC's Public Safety Department Plaintiff still remained a Part-time Public Safety Officer.

85. On or about August 2018, Moris Hernandez, a NHCC housekeeping employee, was hired as a full-time Public Safety Officer. At said time, Plaintiff was still denied a promotion to full-time Public Safety Officer despite having almost eight (8) years of experience at the time of working as a part-time Public Safety Officer and her positive evaluations. As a result on or about August 16, 2018, Plaintiff filed a Complaint with the New York State Division of Human Rights.

**PLAINTIFF'S PROMOTION TO FULL-TIME, CONTINUED DISCRIMINATION AND RETALIATION**

86. Following the filing of Plaintiff's 2018 NYSDHR, on or about September 2018, Plaintiff was promoted to full-time status. As a result, Plaintiff then withdrew her previous 2018 NYSDHR Complaint. Plaintiff's union, CSEA, along with the NYSDHR worked out an agreement with the Human Resources Department at NHCC in which Plaintiff would be promoted to a full-time position as a Public Safety Officer.

87. While Plaintiff received a promotion to full-time status, Defendant LaPLANTE began a campaign of harassment and retaliation against Plaintiff. Defendant LaPLANTE made it his mission to wrongfully cause Plaintiff to be terminated.

88. After withdrawing her complaint, Defendant LaPLANTE began targeting and harassing Plaintiff more often and intensely as a pure act of retaliation and to show his anger that he was forced to promote Plaintiff to a full-time position.

89. One such example of Defendant LaPLANTE's targeting and harassing Plaintiff occurred when he rescinded the "last hour lunch" option she was allowed to take when she was a part-time Public Safety Officer. Last hour lunch was an accommodation which allowed certain Public Safety Department employees to take their lunch break during their last hour, enabling them to leave one hour early once or twice a week. To create a hardship for Plaintiff, after Plaintiff was promoted to full-time status, Defendant LaPLANTE refused to allow Plaintiff to take last hour lunches.

90. Plaintiff had previously used the last hour lunch to pick up her son twice a week. Sgt. Davy, a Black woman, was allowed to use last hour lunch to leave work early in order to pickup her kids. When Plaintiff asked Defendant LaPLANTE about the disparate treatment, he replied "don't compare yourself to her [Sgt. Davy], she is a supervisor."

91. However, per NHCC Human Resources policies, and other applicable laws, all employees had to be treated fairly and equally. However, neither the NHCC Human Resources Department nor the Union took any steps to rectify this discriminatory and disparate treatment to which Plaintiff was subjected. Plaintiff reported the discriminatory treatment to Human Resources at NHCC and eventually, the NHCC's Human Resources Department affirmed that all employees must be treated the same. Defendant LaPLANTE and Plaintiff met with a NHCC Human Resources Representative who informed Defendant LaPLANTE that Plaintiff cannot be prohibited from taking last hour lunch. However, Defendant LaPLANTE only allowed Plaintiff to take her last hour lunch for about one month after the above mentioned H.R. meeting.

92. On or about October 9, 2018, Plaintiff's co-worker and spouse, Garfield Forbes, advised the head of NHCC compliance, Megan Ryan, that Defendant LaPLANTE deliberately and

repeatedly overlooked time theft by Sgt. Davy and Veronica Iadevaia (hereinafter "Ms. Iadevaia"), a timekeeper at the Public Safety Department.

93. On, or about, October 19, 2018, in retaliation against Plaintiff due to her relationship with her family and the internal NHCC Human Resources complaint her husband filed, Plaintiff was reprimanded by Defendant LaPLANTE who wrongfully accused her of having her son on her post (SP1 3rd Fl. Waiting area). Plaintiff explained to Defendant LaPLANTE that her son was only at the hospital to visit a family member who was in labor and delivery, and had to come out to the waiting area when said pregnant family member began having contractions.

94. Several of Plaintiffs former co-workers, including Leo Sullivan, who relieved Plaintiff, advised Defendant LaPLANTE that Plaintiffs son was never on her post. However, Defendant LaPLANTE's official, false reprimand was never rescinded. While Plaintiff did not violate this rule, even if she had, the treatment afforded to her was different than how non-Asian women employees were treated. Defendant LaPLANTE subjected Plaintiff to differential treatment even to the extent of penalizing Plaintiff for allegedly having her minor children present at posts. Plaintiffs former co-worker, Officer G. Sison, a Filipino Fire Safety Officer, was allowed to have his son, a minor, walk around with him for the entirety of his 4:00 p.m. -12:00 a.m. shift. No action was taken against him.

95. Defendant LaPLANTE made it clear that he was going to retaliate against Plaintiff and used the above described occasion to do so. In the past, and prior to Plaintiff's last Division of Human Rights Complaint, Plaintiffs son came to Plaintiffs place of work for about four (4) years while Plaintiff and her husband changed shifts and it was never brought up as an issue until the October 19, 2018 occasion when Defendant LaPLANTE reprimanded Plaintiff. In further support

of Plaintiff's retaliation claims against Defendant LaPLANTE, is the fact that the above referenced "incident" concerning Plaintiff's son was coincidentally reported by Ms. Iadevaia, who was referenced in the complaint Plaintiff's husband filed on or about October 9, 2018.

96. On or about October 19, 2018, Plaintiff was falsely accused of, and reprimanded for, allegedly mentioning her menstrual cycle in the presence of a patient in the psychiatric department. Officer James Vossler (herein "Mr. Vossler") accompanied Plaintiff to the psychiatric unit, because they were called to the unit to assist a police officer with a psychiatric patient who was having an episode.

97. After about 45 minutes the police officer, Plaintiff, and Mr. Vossler were able to calm the patient down. Some time after this, Plaintiff, who at the time was on her period, asked a female supervisor to use the restroom. Additionally, Plaintiff has a documented medical issue that causes her to have severe pain, and blood loss while menstruating. Plaintiff did not mention her period in front of the patient, despite Mr. Vossler's false accusation that she did, and that it caused the patient's episode.

98. As a part of Defendant LaPLANTE's goal of targeting and harassing Plaintiff, Defendant LaPLANTE forced Plaintiff's co-worker, Jamie Lucas (herein "Mr. Lucas"), to sign a false statement against Plaintiff alleging that she made inappropriate remarks about her menstrual cycle in the presence of a patient. Plaintiff's co-worker, Mr. Lucas, who was on probation, sought to correct the record, and submit an accurate statement, but was told by a Union representative not to change his statement and out of fear did not do so. Plaintiff's former co-worker, Officer Young, can attest to the fact that Mr. Lucas wanted to correct the record, but was advised against doing so by a Union representative. Further, the police officer who purportedly witnessed Plaintiff make

offensive remarks never made a statement against Plaintiff because he did not think what was being done was right and he refused to participate.

99. In or about the month of October 2018, as told to Plaintiff by Human Resources Representative, Denise Thomspon, Plaintiff's coworker, Mr. Vossler, a Caucasian man, reported that Plaintiff makes him want to throw up and that whenever Plaintiff goes on calls people get hurt. Ironically, no officer in Plaintiff's department has had more patient altercations than Mr. Vossler. Soon after Mr. Vossler made the offensive remarks about Plaintiff to Human Resources, Mr. Vossler, who also rents an apartment from Defendant LaPLANTE, instead of being disciplined for his offensive comments, Mr. Vossler was promoted to the position of Vehicle Maintenance Officer.

100. On or about October 2018, Plaintiff was again, without reason or justification, taken to Human Resources Representative Denise Thompson, and accused of disrespecting a co-worker. Plaintiff was wrongfully accused of disrespecting her former co-worker, Caleb White, because she called him by his last name without using his tittle Sergeant. However, the general practice of the Public Safety Department was to refer to other officers using their last names. Despite, this commonly followed practice, Plaintiff was reported, and accused of using racist language by calling Mr. White, "White." Plaintiffs' former co-workers also accused her of being racist against White people because she married a Black man.

101. Later that same month in October 2018, Defendant LaPLANTE aggressively questioned and intimidated Plaintiff for discussing with coworkers the details of the reprimand he issued against Plaintiff. Plaintiff informed Defendant LaPLANTE that she discussed the issue with her husband, and that to her knowledge, there was no rule against discussing reprimand details with a coworker. Plaintiff recorded this conversation because of the abusive, aggressive, intimidating

manner and tone Defendant used in communicating with Plaintiff.

102. In or about October 2018, Plaintiff became aware of, and listened to, an audio recording Supervising Officer Rhea Davy made in which she stated that Defendant LaPLANTE, NHCC's Public Safety Department Captain, repeatedly pressured her to write Plaintiff up for frivolous reasons, including for simply requesting training for an assignment Plaintiff had never performed before.

103. After Plaintiff received the promotion, LaPLANTE began trying to force the supervisors to write her up for numerous issues which were false or frivolous. This behavior caused several of the supervisors to rebuff his directives, because they were uncomfortable participating in Defendant LaPLANTE's crusade to discriminate, retaliate against, and try to fire Plaintiff.

104. Defendant LaPLANTE, not only made false allegations against Plaintiff in the hope of causing Plaintiff's termination, he also harassed Plaintiff, denied Plaintiff the use of accommodations and benefits other Public Safety Department employees were afforded, and used derogatory and offensive language to refer to Plaintiff.

105. In or about November 2018, Plaintiff was informed by Zorawar "Prince" Singh that Defendant LaPLANTE repeatedly referred to Plaintiff as an "Indian bitch." Mr. Singh was the only other Indian employee at Defendant NHCC's Public Safety Department, and one of only three Asian individuals employed by the Department. Mr. Singh was also subjected to offensive conduct and remarks from Department employees and Supervisors. For example, Mr. Singh's work Identification Card listed his position as "terrorist," demonstrating the offensive and racist comments and environment Asian employees in the Public Safety Department are subjected to.